UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHANE DRAPEK,                   :
                                :CIVIL ACTION NO. 3:15-CV-1310
        Plaintiff,              :
                                :(JUDGE CONABOY)
        v.                      :
                                :
CAROLYN W. COLVIN,              :
Acting Commissioner of          :
Social Security,                :
                                :
        Defendant.              :
                                :

_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's denial of Plaintiff's Title II claim for a period of Disability Insurance Benefits ("DIB") and Title XVI claim for Supplemental Security Income ("SSI").  (R. 19.)  Plaintiff protectively filed for benefits on May 29, 2012.  (*Id.*)  He alleged disability beginning on November 15, 2006.  (*Id.*)  In her August 5, 2014, Decision, Administrative Law Judge ("ALJ") Therese A. Hardiman concluded that Plaintiff had the following severe impairments: lumbar and thoracic degenerative disc disease/degenerative joint disease post lumbar discectomy and fusion, and lumbar radiculopathy and neuropathy.  (R. 22.)  She also found that Plaintiff had the non-severe impairments of chronic pain syndrome, lumbar myofascial pain syndrome, hypertension, anxiety, and depression.  (R. 22.) The ALJ concluded Plaintiff had the residual functional capacity ("RFC") to perform a narrow range of light work with certain

limitations bringing his RFC more in line with the sedentary level. (R. 24.)  She also concluded there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, and he was, therefore, not disabled from November 15, 2006, through the date of the decision.  (R. 29-30.)

With this action, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ's finding that Plaintiff can perform sedentary/light work is not based on substantial evidence;  2) the ALJ failed to assign the proper weight to treating physicians' opinions; 3) the ALJ did not properly evaluate whether Plaintiff meets or equals Section 1.04 of the listing impairments; and 4) the ALJ's rejection of Plaintiff's testimony and that of Richard Kane is not in accordance with Social Security Administration rules and regulations.  (Doc. 12 at 3.)  For the reasons discussed below, I conclude Plaintiff's appeal is properly denied.

## I. Background

### A.   *Procedural Background*

As noted above, Plaintiff protectively filed for benefits on May 19, 2012.  (R. 19.)  Following the December 21, 2012, initial unfavorable decisions (R. 90-98), Plaintiff filed a request for a hearing by an ALJ (R. 99-100).  Plaintiff appeared and testified at a hearing before ALJ Hardiman on March 4, 2014.  (R. 37-65.) Plaintiff was represented by an attorney, Donald Liggorio, and

Josephine Doherty, a vocational expert ("VE"), testified.  (*Id.*)
ALJ Hardiman issued her unfavorable Decision on August 5, 2014.
(R. 18-32.)  Plaintiff requested a review of the decision on
October 6, 2014.  (R. 7-15.)  The Appeals Council denied the
request on May 14, 2015, thereby making the ALJ's decision the
final decision of the Acting Commissioner.  (R. 1.)  In the Notice,
the Appeals Council stated that it had considered the reasons
Plaintiff disagreed with the ALJ's decision and the additional
evidence presented to the Appeals Council.  (*Id.*)  The Appeals
Council noted that the additional evidence was the October 1, 2014,
Representative's Brief (Exhibit 11E (R. 237-43)) and medical
evidence dated August 28, 2003, through March 6, 2014, from Eric D.
Smith, D.O. (Exhibit 19F (R. 681-743)).  (R. 1-2, 5.)

Plaintiff filed this action on July 2, 2015.  (Doc. 1.)
Defendant filed her Answer (Doc. 7) and Social Security
Administration Transcript (Doc. 8) on September 3, 2015.  Plaintiff
filed his supporting brief on November 2, 2015.  (Doc. 12.)
Defendant filed her opposition brief on January 16, 2016  (Doc. 17)
after having requested and been granted an extension of time within
which to do so (Docs. 14, 15).  Plaintiff filed his reply brief
(Doc. 19) on January 20, 2015.  Therefore this matter is fully
briefed and ripe for disposition.

3

**B.    *Factual Background***

**1.    <u>Impairment Evidence</u>**[1]

   Plaintiff sustained a back injury at work in November 2006. (R. 643.)  December 2006 and August 2007 studies showed large extrusion-type disc herniation at T12-L1 and diffuse disc herniations/bulges at L4-L5 and L5-S1.  (R. 329-30, 509-10.)

   Plaintiff had physical therapy at Mackarey and Mackarey from December 2007 to the end of July 2007.  (R. 250-308.)  At a December 12, 2006, Cervical/Lumbar Evaluation, Plaintiff's primary complaints were "intermittent L/S and R anterior thigh pain"-- problems which resulted from slipping on a carpet while at work on November 15, 2006.  (R. 250.)  He complained of pain with prolonged sitting, standing, walking and bending.  (*Id.*)  On examination, Plaintiff had limitation of range of motion with pain, and moderate tenderness with palpation.  (*Id.*)  Notes indicate that Plaintiff was not working at the time and he reported pain with rising from a chair and going to the bathroom.  (*Id.*)  An April 11, 2007, Progress Report states that, after sixteen weeks of therapy, Plaintiff reported less pain with activities of daily living such as sleep, lifting, and walking, but he continued to complain of lower back pain and leg symptoms on occasion with attempts to increase the intensity of activities.  (R. 293.)  In June and July

---

   [1] The review of evidence of record focuses on evidence relevant to the discussion of Plaintiff's claimed errors.

2007, Plaintiff also had steroid injections which provided some pain relief.  (R. 496-98.)

On October 12, 2007, Plaintiff was admitted to Pennsylvania Hospital and underwent a lumbar discectomy at T12-L1 on the right side and for a T12-L1 disc rupture.  (R. 327.)

Following his surgery, Plaintiff treated with a chiropractor, Mary Ann Hordesky, D.C., and continued to see her through September 2012.  (R. 343-493, 535-65, 631-40.)  On February 14, 2008, Plaintiff complained of lower back pain that was sharp at times and worse with long standing, walking or certain movements.  (R. 343.) He also complained of muscle spasms in his back.  (*Id.*)  Objective physical examination included findings of ambulation with a guarded gait, pain upon lumbar flexion and extension, decreased lumbar rotation, point tenderness at the L4 and L5 facet joint regions, positive straight leg raise on the right at 55 degrees, and joint dysfunction in the cervical, thoracic and lumbar regions.  (*Id.*) Dr. Hordesky made similar findings during the course of treating Plaintiff although she regularly noted that Plaintiff had less pain and greater freedom of motion post treatment.  (*See*, *e.g.*, R. 450, 460, 537, 564.)

Between January 22, 2008, and February 18, 2008, Plaintiff again had physical therapy at Mackarey and Mackarey.  (R. 504, 507.)  The February 18, 2008, Progress Report indicated that Plaintiff reported a complete resolution of the increase in

symptoms but he continued to have complaints including fifteen minute walking intolerance, constant right lateral thigh numbness, and occasional radiation of pain into the left leg.  (R. 507.) Some limitation in strength, range of motion, and sensation were noted.  (*Id.*)

On April 28, 2008, Plaintiff saw Elmo Baldassari, DPM/cw, who noted that Vincent Bianca, M.D., was Plaintiff's primary care physician whom he saw regularly.  (R. 503.)  Plaintiff presented with the chief podiatric complaint of chronic pain and numbness in his right leg, lower leg and foot which had been present for about two years.  (*Id.*)  Objective examination showed diminished neurovascular structures, paresthesia and burning to bilateral lower extremities, and sensory deficit.  (*Id.*)  Dr. Baldassari's plan included the following:

> Recommend Lyrica 75 mg BID to see if this helps resolve some of his pain and symptomatology.  He was casted for custom orthotics.  I do feel this will help with some of his arch pain and take some pressure off his lower back.  I explained to him that I do feel he is permanently disabled and I do not feel that this is going to resolve.  I think that the radiculopathy stems from his injury and surgery and I do not feel that he will improve at any time in the future.  This will have to be tolerated unless controlled with medication which he is presently on and maybe Lyrica or Cymbalta.

(*Id.*)

On January 4, 2011, Dr. Bianca stated that Plaintiff continued to have chronic pain syndrome with multiple level disc degeneration

6

above and below the surgery.  (R. 514.)  He also reported that
Plaintiff had difficulty sitting, walking, and standing, difficult
ambulation, difficulty walking up a flight of stairs without
stopping a couple of times, and severe muscle spasm.  (*Id.*)  Dr.
Bianca specifically found the following:

> He has pain on palpation over the L5-S1
> area and also the lower T spine.  There is
> paravertebral muscular spasm noted
> throughout.  Flexion and extension is down to
> about 40 degrees.  Lateral flexion to the
> right and left is 5 degrees.  The muscle
> strength in the right lower extremity is
> about 3 out of 5, left lower extremity is 4
> out of 5.  No muscle wasting.  He has
> decreased sensation to pinprick and pressure
> in the right lower extremity and into the mid
> calf and foot.  Gait and station - he has a
> swagger and limp and widened gait and
> station.

(R. 514.)  These findings are similar to other post-surgical
evaluations, including December 2008 (R. 521), March 2009 (R. 520),
November 2009 (R. 518), and July 2010 (R. 516).  In December 2008,
Dr. Bianca recorded that Plaintiff continued on Flexeril and Motrin
and would hopefully improve with physical therapy in the swimming
pool "otherwise it will be a maintenance type of program for this
patient at this time."  (R. 521.)  In November 2009, he noted that
Plaintiff had increased episodes of leg weakness.  (R. 518.)  He
also noted on July 19, 2010, that Plaintiff reported an episode of
worsening low back and mid back pain radiating into his right leg
which had given out on him several times.  (R. 516.)  Dr. Bianca
noted that Plaintiff had "severe ambulatory dysfunction" as a

7

result of multiple level disc disease, and he had "numbness and pain intermittently down the leg with intermittent weakness and the leg giving out intermittently." (R. 516.) As of January 2011, Plaintiff's medications included Diovan, Rozerem, Lopressor, Flexeril, Motrin, Voltaren gel, and a Flector patch intermittently. (R. 514.)

Between July 2010 and January 2011, Plaintiff saw Leroy Pelicci, M.D., a neurologist and pain management specialist, once a month. (R. 524-32.) As of January 19, 2011, Dr. Pelicci reported that Plaintiff

> continues to do well with our treatment. A significant portion of his stiffness, his burning, his inflexibility, comes under control, with the injections, also, coupled with this, is the therapy, with Dr. Hordesky. He has pain that travels from his low back down into his hips and legs. The right side continues to be the more problematic side. He still walks with a limp. He guards the right, and puts more weight on the left. He still has significant spasm, by the time he presents.

(R. 524.) Dr. Pelicci administered a series of myofascial injections and prescribed Vicodin for pain. (R. 524, 525, 526, 529, 530, 531, 532.) Dr. Pelicci recorded the following "Impression" on an EMG study of the lower extremities conducted on October 11, 2010: "Nerve roots L-4, L-5, S-1 revealed bilateral involvement, moderate in nature, with right sided predominance. Paralumbar sacral spinal musculcature showed denervation supporting a proximal nerve root process. T-10 through T-12 showed non-

specific findings with spasm, off to the right." (R. 528.)

Between April 2011 and September 2012, Plaintiff saw Kurt Moran, M.D., for pain management. (R. 569-606.) Dr. Moran prescribed Oxycodone and Neurontin for pain, Valium for sleep, and Medrol dose packs for flair ups of pain. (*Id.*) In July, September, and November 2011, and January and March 2012, Plaintiff complained of lower back pain with spasms and sometimes complained of difficulty sleeping but "current status" regularly indicated he was managing his activities of daily living with the medications. (R. 581, 585, 589, 593, 597.)

Plaintiff had a consultative examination with Dr. Bianca in December 2012. (R. 643-45.) Dr. Bianca noted that postoperatively Plaintiff still had muscle spasm in the area, intermittent severe thoracic spine pain and continued right lower extremity weakness. (R. 643.) He further noted that Plaintiff was unable to walk more than a block on level ground, he could not walk up a flight of stairs, and he had chronic pain "pretty much on a daily basis" along with insomnia and anxiety depressive disorder secondary to chronic pain syndrome. (*Id.*) Examination showed absent reflexes and 3/5 muscle strength in the right lower extremity, a severely disturbed gait with a widened gait and unsteadiness, pain on palpation of the thoracic spine over the area of the surgery along with paravertebral muscular spasm on the right side, decreased flexion and extension of the thoracic spine, lumbar spine flexion

9

and extension 50 degrees, and lateral flexion right and left 10 degrees.  (R. 645.)  Dr. Bianca concluded that Plaintiff demonstrated "thoracic spine radiculopathy and neuropathy secondary to discectomy with fusion, right lower extremity weakness, ambulatory dysfunction secondary to that, chronic pain syndrome, severe anxiety and depression secondary to the chronic pain, chronic muscle spasm, and hypertension."  (*Id.*)

Plaintiff again saw Dr. Moran between July 2013 and February 2014.  (R. 663-80.)  Plaintiff continued to have lower back pain which frequently was noted to radiate down his right leg.  (R. 663-79.)  His pain varied with activity and ranged from five to nine on a scale of one to ten.  (*Id.*)  On several visits, it was noted that Plaintiff had a normal gait.  (R. 668, 670, 672.)  In November 2013, it was also noted that Dr. Moran wanted Plaintiff to have an MRI but Plaintiff said it was too costly.  (R. 671, 672.)

On March 25, 2014, Plaintiff's attorney provided additional records to the Social Security Administration--a March 6, 2014, prescription for a cane from Dr. Moran and a Medical Source Statement from Eric D. Smith, D.O.  (R. 655-58.)  The March 6, 2014, prescription says "Cane Re: ambulatory dysfunction."[2]  (R. 658.)

Records presented only to the Appeals Council, and therefore

---

[2]  The Medical Source Statement is reviewed in the Opinion Evidence section of this Memorandum.

not considered by the ALJ, are summarized in the margin.[3]

---

[3] As noted in the text, *see supra* p. 3, the Court Transcript contains additional records from Eric Smith, D.O., with dates ranging from August 28, 2003, to March 6, 2014. (R. 681-743.) Most of this evidence was not before the ALJ but was presented to the Appeals Council, which concluded the additional evidence did not provide a basis for changing the ALJ's decision. (R. 2.) Some of these records reflect treatment provided by Dr. Bianca and others, and it is unclear precisely when Dr. Smith became Plaintiff's primary care physician. (*Id.*) The records show that Plaintiff was seen several times from January 2011 through January 2014. (R. 684-743.) October 1, 2013, office notes signed by Dr. Smith indicate that Plaintiff was in as a new patient for chronic back pain from a work injury. (R. 685.)

October 1, 2012, office notes are unsigned and the provider is not identified. ((R. 742.) The notes contain the following initial summary:

> This young male returns today with continued right leg pain radiating from his lower back. He is postoperative from a T12-11 lesion by Semyon in Philadelphia. He has chronic pain syndrome, multiple level disk disease above and below the previous surgery and difficulty sitting, standing and walking. Ambulation is severely difficult. He cannot steady himself and has severe muscle spasm causing severe pain. Secondary to this he is suffering from severe anxiety depression from the chronic pain and inability to ambulate.

(R. 742.) They also contain the following physical examination findings and summary:

> He has pain over the T spine and L5-S1 area with perivertebral muscular spasm throughout. Flexion and extension is about 40 degrees. Lateral flexion to the right and left is 5 degrees in the LS spine. Muscle strength of the right lower extremity is 3 out of 5 and left lower extremity is about 4 out of 5. He has decreased sensation to pinprick and pressure in the right lower extremity into the mid calf and foot. Gait and station - he has a widened gait and

2.   **Opinion Evidence**

On December 19, 2012, Anne C. Zaydon, M.D., a state agency physician, completed a residual functional capacity evaluation for DIB (date last insured of December 31, 2010) after reviewing Plaintiff's medical records.  (R. 73-74.)  She found that one or more of Plaintiff's medically determinable impairments could

---

> station.
>
> At this time he is not responding well to conservative measure.  He needs to be treated for his increasing pain syndrome and anxiety and depression.  I initiated Elavil 25 mg. . . . to be used daily and to be increased every ten days to two weeks by 100%. . . . Otherwise he is to continue his Divan HCT 320 12-5 one a day and Lopressor 100 bid. Flexeril 10 mg. bid, Motrin 800 mg tid.  We will recheck him in the next six weeks.  I also ordered a cane for him to steady his gait and station.

(R. 742.)

November 12, 2012, office notes (unsigned and no provider identified) indicate that the Elavil, which had been added to his medication regimen the previous month for pain control and insomnia, was giving Plaintiff about three to four hours of rest at night.  (R. 743.)  The pain control was described as "fair" but Plaintiff continued to have severe pain in the T12-11 area as well as muscle spasm, and difficulty sitting, standing, walking and bending back.  (*Id.*)  Examination showed that Plaintiff had a widened gait and station, and "a stooped forward position secondary to muscle spasm located in the paravertebral muscular area of the T and upper LS spine."  (*Id.*)

Records from the fall of 2013 and early 2014 are not as detailed but show that Plaintiff continued to complain of back pain and his diagnoses included postlaminectomy syndrome of the thoracic region.  (*See*, *e.g.*, R. 687, 689.)

reasonably be expected to produce his pain or other symptoms, and his statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence alone.  (R. 72-73.)  She concluded that Plaintiff had exertional limitations: he was able to lift and/or carry twenty pounds occasionally and ten pounds frequently; he was able to stand and/or walk a total of four hours for a total of about six hours in an eight hour day; his ability to push and/or pull was limited in his right lower extremity.  (R. 73.)  Regarding postural limitations, Dr. Zaydon found that Plaintiff could occasionally climb ramps/stairs, never climb ladders, ropes or scaffolds, could frequently balance and stoop, occasionally kneel and crouch, and never crawl.  (R. 73-74.)  Environmentally, Dr. Zaydon opined that Plaintiff should avoid concentrated exposure to extreme heat, cold, humidity, fumes, odors, dusts, gases and poor ventilation, and he should avoid even moderate exposure to hazards such as machinery and heights.  (R. 74.)  Dr. Zaydon commented that Plaintiff was doing well at his December 2, 2010, neurologist visit--his pain was under control and he was getting relief from injections.  (*Id.*)  Dr. Zaydon added that she was unable to determine credibility as of the date last insured.  (*Id.*)

Dr. Zaydon also completed an evaluation of Plaintiff for SSI benefits on December 19, 2012.  (R. 83-85.)  She again found that one or more of Plaintiff's medically determinable impairments could

13

reasonably be expected to produce his pain or other symptoms, and his statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence alone.  (R. 83.)  She concluded that Plaintiff had exertional limitations: he was able to lift and/or carry twenty pounds occasionally and ten pounds frequently; he was able to stand and/or walk of a total of three hours for a total of about six hours in an eight hour day; his ability to push and/or pull was limited in his right lower extremity.  (R. 83-84.) Regarding postural limitations, Dr. Zaydon found that Plaintiff could occasionally climb ramps/stairs, never climb ladders, ropes or scaffolds, could frequently balance and stoop, occasionally kneel, and never crouch or crawl.  (R. 84.)  Environmentally, Dr. Zaydon opined that Plaintiff should avoid concentrated exposure to extreme heat, cold, wetness and humidity, and he should avoid even moderate exposure to hazards such as machinery and heights.  (R. 84-85.)  Unlike her DIB assessment where she concluded that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, in this assessment Plaintiff's exposure to these environmental conditions was unlimited.  (R. 74, 85.)  Dr. Zaydon specifically referenced Dr. Bianca's December 5, 2012, consultative examination and his findings regarding back pain, right lower extremity weakness, absent right lower extremity reflexes, 3/5 right lower extremity strength, wide and unsteady

14

gait, and tender thoracic spine with decreased range of motion. (R. 85.)  Dr. Zaydon found that Plaintiff was partially credible: treatment of his spine disorder was conservative, he cared for himself and his home, and he drives.  (R. 85.)

Eric Smith, D.O., completed a Medical Statement of Plaintiff's Ability to Perform Work-Related Physical Activities on March 6, 2014.  (R. 656-57, 682-83.)  Dr. Smith concluded the following: Plaintiff could occasionally lift or carry up to ten pounds and could never lift or carry more than that; he could stand and walk for one to two hours in an eight hour day and would need to use a cane for balance and ambulation; Plaintiff could sit for less than six hours and would need to get up and change position every thirty minutes; he was limited in his ability to push and pull--his need to change positions made operation of hand controls difficult and operation of foot controls was impossible because of his radicular symptoms.  (R. 656, 682.)  Dr. Smith concluded that Plaintiff could never bend, kneel, stoop, crouch, balance, or climb.  (R. 657, 683.)  He also found that Plaintiff's abilities to reach and handle were affected by his impairments, and he had environmental restrictions regarding poor ventilation, heights, and moving machinery.  (R. 683.)

An undated document titled "Interrogatories Addressed to Treating Physician" was attached to correspondence from Plaintiff's attorney to the Social Security Administration dated March 25,

2014.  (R. 659-61.)  The letter stated that the attached were "updated medical records" from Dr. Moran.  (R. 659.)  Dr. Moran stated that his diagnoses were supported by MRIs and EMGs.  (R. 660.)  He opined that, because of his lumbar radiculopathy, Plaintiff required a cane to assist him with ambulation and balance when he was on his feet for a long time.  (R. 660.)  He added that Plaintiff requires a cane "for being steady on his feet while walking long distances."  (R. 661.)

## 3.   **Hearing Testimony**

At the March 4, 2014, hearing before ALJ Hardiman, Plaintiff testified that he had not worked since his workplace injury in 2006 and he had received Workers' Compensation until January 2011.  (R. 42.)  Plaintiff stated that he lived with his mother in a two-story home, he went up and down the stairs about three times a day, he was able to take care of his personal needs, and was not able to do all household chores.  (R. 43, 44.)  He said he was able to drive the two-minutes to the store and shop for about twenty minutes but he did not drive long distances.  (R. 50.)  He added that a friend had driven him most of the way to the hearing.  (R. 51.)  Plaintiff testified that the heaviest thing he lifted in the preceding month was a half-gallon of milk, he was able to raise and lift his legs from a seated position and put them down, he could extend his arms forward and bring them back and he could reach overhead.  (R. 44-45.)  He said he gets about three hours of sleep per night because

16

the pain in his lower back and right leg wakes him up.  (R. 45.)
Plaintiff reported that he was able to stand for fifteen minutes
before he had to either sit or walk, he could sit for about thirty
minutes before he had to stand, and he could walk for about fifty
yards.  (*Id.*)

Plaintiff listed his medications at the time: Oxycodone and
Valium prescribed by Dr. Moran, Zoloft prescribed by Dr. Smith, and
Metoprolol, Lisinopril, and Triam for the treatment of his blood
pressure.  (R. 45-46.)  Plaintiff said his medications helped "to a
certain point" and he also did some stretches and tried to walk to
help with the symptoms.  (R. 46.)  Plaintiff identified weather and
having to pick up something heavy as aggravating factors.  (R. 47.)
Plaintiff described the pain in his back as stabbing and burning,
"like somebody has their knuckle in my back, with a constant pain."
(*Id.*)  He noted that medication relieves the pain for up to forty-
five minutes.  (*Id.*)

Regarding the use of a cane, Plaintiff said he uses it eighty
to ninety percent of the time because it relieves the pain in his
lower back and leg and helps him balance and avoid problems if his
knee gives out.  (R. 48, 50.)  He said he also uses the cane when
he is standing in place for the half-hour or forty-five minutes he
is able to stand.  (R. 49.)

When asked about possible surgery on his lower back, Plaintiff
said that by the time he was ready to go for another surgery, he

17

did not have any insurance and had no means to pay for a surgery or diagnostic study.  (R. 49.)

Plaintiff said he did not think he was able to do a job eight hours a day even if he could sit and stand at the job because he can only keep alternating positions for so long and then he had to lie down due to extreme pain.  (R. 52.)

Vocational Expert Josephine Doherty testified that sedentary duty, unskilled positions such as inspector, charge-account clerk, and ticket counter would be available to an individual of the same age, education and past work experience as Plaintiff with a right lower extremity push/pull limitation to occasional, who could occasionally climb, balance, stoop, kneel, crouch, and crawl but never climb on ladders, who would need to avoid temperature extremes, humidity, vibration, fumes and hazards, who would need a sit/stand option at will, and could stand and walk two hours in an eight-hour day and sit for six hours, and the individual was limited to simple, routine tasks, low stress and only occasional changes in the work setting.  (R. 56-58.)  The VE also testified that the individual could not perform any competitive work if the he required breaks in excess of the normal two per day plus lunch, and/or unscheduled breaks of varying lengths throughout the day, and/or could reasonably be expected to be absent three times per month; and/or could reasonably be expected to be off task more that twenty percent of the day.  (R. 59-60.)

18

Plaintiff's attorney asked the VE whether Plaintiff would be able to perform any of the identified positions if he needed to use an assistive device to stand or balance.  (R. 60.)  The VE answered that if an individual needed to use an assistive device in his hand at all times when he was standing, the assistive device would interfere with performing the job when standing.  (R. 61.)  She also testified that the inspector job would need both hands almost all the time.  (*Id.*)  The VE did not address the needs of the charge account clerk and ticket counter in relation to the use of a cane.

ALJ Hardiman asked Plaintiff's counsel if he planned to submit evidence to the fact that Plaintiff was prescribed a cane, that he had a balance issue that had been diagnosed, and proof that he needs the cane "'24/7' to balance or ambulate."  (R. 62.) Plaintiff's attorney responded that he thought the evidence could reasonably support what was said about Plaintiff's need for a cane. (*Id.*)

4.   **Third Party Evidence**

Third-party evidence in the form of a letter from Plaintiff's neighbor Richard Kane indicates he had known Plaintiff since he was born forty-four years earlier.  (R. 235.)  Mr. Kane said that Plaintiff had previously maintained his parents property but he had been unable to do so since his accident in 2006.  (*Id.*)  Mr. Kane noted that he and his sons helped out with cutting the grass and

19

clearing snow because Plaintiff was unable to do these things without extreme pain.  (*Id.*)

**5.    ALJ Decision**

ALJ Hardiman made the following Findings of Fact and Conclusions of Law in her August 5, 2014, Decision.

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.   The claimant has not engaged in substantial gainful activity since November 15, 2006, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq).

3.   The claimant has the following severe impairments: lumbar and thoracic degenerative disc disease/degenerative joint disease status post lumbar discectomy and fusion, and lumbar radiculopathy and neuropathy (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform a narrow range light work as defined in 20 CFR 404.1567(a), except that light work is substantially reduced in that the claimant can stand/walk no more than 2 hours, sit for 6 hours in an 8-hour workday, sit 6 hours in  an 8-hour day, further he requires a sit/stand option at his will or direction, bringing this more in line

20

with a sedentary residual functional
capacity.  He can occasionally push/pull
with the right lower extremity and
occasionally climb, balance, stoop,
kneel, crouch, and crawl but never climb
on ladders.  He must avoid temperature
extremes, humidity, vibration, fumes,
and hazards.  Mentally, he is limited to
simple, routine tasks and low stress
work.  Low stress defined as only
occasional decision making and only
occasional changes in the work setting.

6.   The claimant is unable to perform any
     past relevant work (20 CFR 404.1565 and
     416.965).

7.   The claimant was born on July 8, 1969
     and was 37 years old, which is defined
     as a younger individual age 18-44, on
     the alleged disability onset date (20
     CFR 404.1563 and 416.963).

8.   The claimant has at least a high school
     education and is able to communicate in
     English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not
     material to the determination of
     disability because using the Medical-
     Vocational Rules as a framework supports
     a finding that the claimant is "not
     disabled", whether or not the claimant
     has transferable job skills (See SSR 82-
     41 and 20 CFR Part 404, Subpart P,
     Appendix 2).

10.  Considering the claimant's age,
     education, work experience, and residual
     functional capacity, there are jobs that
     exist in significant numbers in the
     national economy that the claimant can
     perform (20 CFR 404.1569, 404.1569(a),
     416.969, and 416.969(a).

11.  The claimant has not been under a
     disability, as defined in the Social
     Security Act, from November 15, 2006,

21

> through the date of this decision (20
> CFR 404.1520(g) and 416.920(g)).

(R. 21-30.)

In support of her decision, ALJ Hardiman noted that no treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment. (R. 24.) She specifically considered listing 1.04 (Disorders of the Spine) and concluded Plaintiff did not meet all of the listing requirements. (*Id.*)

In determining Plaintiff's RFC, ALJ Hardiman reviewed the medical evidence, noting in several instances the relatively benign and normal objective findings. (R. 26-28.) ALJ Hardiman afforded limited weight to the form completed by Dr. Moran regarding the use of a cane because the opinion is inconsistent with his records and not well supported on the face of the opinion or the record as a whole. (R. 26.)

She also assigned little weight to Dr. Smith's opinion, first noting that there were no actual records from Dr. Smith. (R. 26.) She also discounted the opinion because of a lack of explanation for postural limitations, inconsistencies regarding lifting capacity and reaching/handling limitations, abilities to bend/stoop in relation to sitting, certain capabilities Plaintiff testified about related to limitations assigned in the opinion, as well as the general observations that the opinion was neither well supported on its face or by the record as a whole. (*Id.*)

22

Regarding Dr. Zaydon's opinions, the ALJ assigned some weight to the finding that Plaintiff could perform a narrow range of light exertion work with standing/walking limited to three hours, and instead concluded that Plaintiff was able to stand and walk for two hours and he needed sit/stand option. (R. 27.) ALJ Hardiman assigned great weight to other limitations assessed by Dr. Zaydon, finding them consistent with the record as a whole. (*Id.*)

She assigned little weight to Dr. Baldassari's opinion because it addresses the ultimate issue of disability, is based on limited treatment and was not well supported. (R. 28.) Regarding the extent of treatment, the ALJ noted there was no evidence that Plaintiff saw Dr. Baldassari more than once. (*Id.*)

Regarding Plaintiff's credibility, ALJ Hardiman concluded that the "longitudinal evidence of record does not support the claimant's allegations concerning the intensity, persistence, and limiting effects of his symptoms." (R. 28.) She reviewed Plaintiff's activities of daily living, finding that they undermine Plaintiff's credibility and are inconsistent with a finding of disability. (*Id.*)

ALJ Hardiman also found third party evidence from Richard Kane entitled to little weight. (R. 27.) She concluded his statements were not consistent with the preponderance of opinions and observations of medical doctors in the case, he was not medically trained to make exacting observations, and he could not be

23

considered a disinterested third party because he was Plaintiff's friend. (*Id.*)

Regarding the step five determination that jobs existed in significant numbers in the national economy that Plaintiff could perform, the ALJ identified the representative occupations of inspector, charge account clerk, and ticket counter, all sedentary exertion, unskilled positions. (R. 29-30.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[4]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the

---

[4]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 29.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

27

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

As set out above, Plaintiff alleges the following errors: 1)

28

the ALJ's finding that Plaintiff can perform sedentary/light work is not based on substantial evidence;  2) the ALJ failed to assign the proper weight to the treating physicians' opinions; 3) the ALJ did not properly evaluate whether Plaintiff meets or equals Section 1.04 of the listing impairments; and 4) the ALJ's rejection of Plaintiff's testimony and that of Richard Kane is not in accordance with Social Security Administration rules and regulations.  (Doc. 12 at 3.)  Because the ALJ's consideration of the treating physician's opinions and Plaintiff's credibility in part formed the basis of her RFC determination, I will first address Plaintiff's errors regarding these issues.

## A.    *Treating Physicians' Opinions*

Plaintiff asserts the ALJ erred in that she did not give proper weight to the opinions of Dr. Moran and Dr. Smith.  (Doc. 12 at 20-24.)  Defendant maintains the ALJ reasonably considered these opinions.  (Doc. 17 at 15-22.)  I conclude the ALJ did not err on this basis.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  The "treating physician rule," is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit.

*Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[5]  "A

---

[5] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20

> C.F.R. § 404.1527(d)(2).  "Although the ALJ
> may weigh the credibility of the evidence, he
> must give some indication of the evidence that
> he rejects and his reason(s) for discounting
> that evidence."  *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46.  *Horst* noted that neither the ALJ nor the court

needed to rely on the treating physician's opinion that the

plaintiff was completely disabled: "As an initial matter, 'the

ALJ--not treating or examining physicians or State agency

consultants--must make the ultimate disability and RFC

determinations."  551 F. App'x at 46 n.7 (quoting *Chandler v.

Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20

C.F.R. § 404.1527(d)).  Although it is true that an ALJ's

credibility judgments alone cannot override a treating physician's

medical opinion that is supported by the evidence, *Morales v.

Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon

more than personal observations and credibility determinations in

discounting the treating physician's finding of disability," the

ALJ does not run afoul of relevant law.  *Drejka v. Commissioner of

Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not

precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318

(3d Cir. 2000) (holding that an ALJ's credibility judgments alone

cannot override a treating physician's medical opinion that is

supported by the evidence)).  *Drejka* also noted that where the

treating physician made the determination the plaintiff was

disabled only in a form report, the Third Circuit Court has

characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

## 1.  **Eric Smith, D.O.**

As set out above, the ALJ provided multiple reasons for assigning little weight to the opinion of Dr. Smith.  (R. 26.) Regarding the lack of records provided by Dr. Smith, Plaintiff asserts this statement is factually inaccurate.  (Doc. 12 at 20.) He states that "a copy of Dr. Smith's records were provided. Claimant's counsel specifically asked for additional time to provides those records in a letter to the ALJ." (*Id.* (citing R. 681-743).)  The cited pages do not contain a letter from Plaintiff's counsel to the ALJ (or anyone else) requesting additional time to provide records.  However, *in post-decision correspondence to the Appeals Council* dated October 1, 2014, Plaintiff's counsel indicates he has enclosed a brief in support of his request for a review of the ALJ's Hearing Decision/Order.  (R. 9.)  In the brief, Plaintiff's counsel notes that "[a] copy of Dr. Smiths [sic] records are being submitted with Mr. Drapek's appeal." (R. 12.)  This review of evidence shows that ALJ Hardiman did not have the benefit of any treatment records from Dr. Smith when she issued her August 5, 2014, decision.  Thus, her statement is not factually inaccurate.

33

Moreover, as set out above, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews*, 239 F.3d at 593. Therefore, Plaintiff cannot rely on treatment records from Dr. Smith to undermine the weight assigned by ALJ Hardiman to Dr. Smith's opinion. Plaintiff's attempt to discount the ALJ's finding regarding Dr. Smith's records with the inference that Dr. Smith took over Dr. Bianca's practice (Doc. 12 at 20) is unavailing--even now Plaintiff provides no citation to support an inference that the records of these two physicians should be considered in tandem, and our independent review of the records supplied to the Appeals Council provides no such support.[6] For similar reasons, I am unpersuaded by Plaintiff's assertion that this Court should consider Dr. Bianca's records to conclude that Dr. Smith is in fact a treating physician. (Doc. 12 at 21.) The rationale that Dr.

---

[6] In the Medical Records portion of his supporting brief, Plaintiff notes, without citation, that after January 2011, Dr. Bianca's practice was taken over by Eric Smith, D.O. (Doc. 12 at 7 n.1.) Records provided to the Appeals Council contain October 1, 2013, office notes signed by Dr. Smith in which Plaintiff is identified as a new patient. (R. 685.) These records also contain unsigned notes from October 1, 2012, and November 12, 2012, office visits which do not identify the provider. Thus, I cannot determine when Dr. Smith became Plaintiff's primary care physician or how often he treated Plaintiff. Moreover, this issue is not relevant to the question of whether the ALJ properly evaluated Dr. Smith's March 6, 2014, opinion because ALJ Hardiman did not have any records from a primary care physician after Dr. Bianca's January 4, 2011, office visit notes (R. 514-15) and his December 5, 2012, Disability Evaluation (R. 643-45).

Smith's "records only became material when the ALJ utilized a lack of records as a basis to reject the opinions of Dr. Smith" (*id.* at 20), does not explain or excuse the fact that a treating physician's records were not submitted to the ALJ nor does it establish the necessary treating relationship.

In the context of the record as a whole, the absence of records from Dr. Smith takes the legs out from Plaintiff's argument that the opinion was entitled to treating physician deference. Plaintiff's remaining arguments do not offset this flaw.  While Plaintiff correctly notes that the ALJ wrongly claimed that Dr. Smith opined that Plaintiff could lift 100 pounds and this inaccuracy rendered her claimed inconsistency with reaching and handling limitations invalid (Doc. 12 at 20), the ALJ's lifting related inconsistency is just one of many reasons she found the opinion entitled to little weight.  The ALJ's claimed inconsistency regarding the ability to sit and stand as conflicting with the lack of ability to stoop (R. 26), as argued by Plaintiff, is also not a valid basis to undermine Dr. Smith's opinion.  (*See* Doc. 19 at 3-4.)  Eliminating these two bases for the ALJ's conclusion does not warrant a finding that her consideration of Dr. Smith's opinion is not based on substantial evidence.  In addition to the lack of records, the ALJ is correct that Dr. Smith provides no explanation for many limitations noted and that Plaintiff testified that he

could perform certain activities which Dr. Smith precluded.[7]  (R. 26.)  Further, the ALJ's conclusion that the March 6, 2014, opinion was not supported by the record as a whole (*id.*) cannot be deemed error when the last primary care visit of record was with Dr. Bianca over two years earlier on January 4, 2011 (R. 514-15), Dr. Bianca' December 2012 Disability Evaluation (R. 643-45) was over a year earlier, and the most recent treatment notes of record--those of Dr. Moran from July 2013 to February 26, 2014, submitted by Plaintiff's counsel on March 25, 2014--indicated that Plaintiff had a normal gait, his symptoms were helped/controlled with medications, and he was able to do things around the house (R. 663-73)[8].

2.  **Kurt Moran, M.D.**

Plaintiff criticizes the ALJ's rejection of Dr. Moran's opinion on the basis that his records did not show difficulty with gait.  (Doc. 12 at 21.)  Plaintiff states it is not clear that Plaintiff's gait was evaluated at each visit and there was no need to do so because his gait problems were previously established in Dr. Bianca's records.  (*Id.*)  While Plaintiff's assertions may be

---

[7]  I agree with Defendant that, to the extent Plaintiff argues that the case should be remanded under sentence six for the consideration of Dr. Smith's treatment records submitted to the Appeals Council, the argument fails because Plaintiff has not made the requisite showing.  (*See* Doc. 17 at 19 & n.3 (citing *Matthews*, 239 F.3d at 592-93; 42 U.S.C. § 405(g)).)

[8]  Not all records are legible.  (*See*, *e.g.*, R. 675-80.)

true, they do not negate the fact that many of Dr. Moran's office notes indicate that Plaintiff's gait was normal (R. 668, 670, 672) and his records overall for the time period under consideration (May 29, 2012, to August 5, 2014 (R. 25)) neither suggest gait problems nor support the need for a cane (R. 569-78; 663-80). Although Dr. Bianca's records and Disability evaluation establish ambulation difficulties and gait problems (*see*, *e.g.*, R. 514, 645), these findings at most establish contradictory records and do not necessarily indicate the necessity of the use of an assistive device.[9]  For these reasons, Plaintiff has not shown that the ALJ's determination regarding Dr. Moran's opinion is not based on substantial evidence.

## 2.   **Credibility**

Plaintiff asserts the ALJ erred in rejecting Plaintiff's testimony and that of his neighbor, Richard Kane.  (Doc. 12 at 29.) Defendant maintains the ALJ reasonably considered the credibility of Plaintiff and his neighbor.  (Doc. 17 at 27.)  I conclude this claimed error is not cause for remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F.

---

[9]  Records from an unknown source indicating that a cane was ordered for Plaintiff in October 2012 "to steady his gait and station" (R. 742) were not before the ALJ.

App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).  An ALJ is not required to specifically mention relevant Social Security Rulings.  *See Holiday v. Barnhart*, 76 F. App'x 479, 482 (3d Cir. 2003).  It is enough that his analysis by and large comports with relevant provisions.  *Id.*

The regulations provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

Plaintiff states that the ALJ cites no specific inconsistencies in Plaintiff's activities.  (Doc. 12 at 29.) However, ALJ Hardiman specifically notes that she finds Plaintiff's

38

testimony that he goes up and down stairs three times a day, performs self-care, shops and does a variety of other activities inconsistent with the limitations found by Dr. Smith.  (R. 26.) She also notes that Plaintiff testified that medications help his symptoms and he stated on his Function Report that he did laundry, dusted, and vacuumed, and cooked meals. (R. 28.)  She also noted his post-surgical routine and conservative treatment as well as the limited treatment with his family doctor and chiropractor since settling his workers' compensation claim serve to undermine his credibility concerning the intensity, persistence and limiting effects of his symptoms.  (*Id.*)  Because Plaintiff's scant assertions on the issue of his own credibility (Doc. 12 at 29-30) do not satisfy his burden of showing that the ALJ improperly assessed his credibility, we have no basis to conclude her assessment is not based on substantial evidence.

Similarly, Plaintiff has not shown that the ALJ's assessment of Mr. Kane's third-party evidence is error.  Moreover, we conclude that any error in the evaluation of Mr. Kane's letter would be harmless in that his letter at most would establish that Plaintiff is unable to shovel snow, cut grass and plant flowers because of pain related to his work injury.  (R. 235.)  As ALJ Hardiman's RFC is for light/sedentary work, Plaintiff would not be required to perform any functions such as those identified by Mr. Kane.

## C. *Residual Functional Capacity Assessment*

Plaintiff asserts that the ALJ's conclusion that Plaintiff is

capable of doing sedentary/light work is not based on substantial evidence because it is not consistent with Plaintiff's limitation that he can stand and walk for two hours in an eight hour day with a sit/stand option and his need to use a cane to stand or balance for any period of time. (Doc. 12 at 18.) Defendant maintains the ALJ's RFC is supported by substantial evidence. (Doc. 17 at 13.) I agree.

Plaintiff's main contention is that the RFC did not properly take into account Plaintiff's need to use a cane to stand or balance for any period of time. (Doc. 12 at 18.) As discussed above, the evidence before the ALJ supporting Plaintiff's need for a cane was undermined by other evidence of record. The record also shows that Dr. Moran *did not* opine that Plaintiff needed a cane whenever he stood or walked. (R. 660-61.) Rather, Dr. Moran related Plaintiff's need for a cane to assist with ambulation and balance to situations when he was on his feet for a long time or walking long distances. (*Id.*) As the RFC requires neither, Dr. Moran's assessment of when Plaintiff would need a cane is not inconsistent with ALJ Hardiman's RFC. Further, ALJ Hardiman advised Plaintiff's counsel at the March 4, 2014, hearing, that the limitations related to the use of a cane urged by Plaintiff's counsel would need to be supported by evidence that he needed the cane "24/7 in order to balance or ambulate" (R. 62) and no such evidence was provided to the ALJ.

40

**4.   Listing 1.04**

Plaintiff asserts that the ALJ did not properly evaluate whether he meets listing 1.04 and that his impairment meets this listing.  (Doc. 12 at 24.)  Defendant contends that substantial evidence supports the ALJ's finding that Plaintiff did not meet or medically equal Listing 1.04.  (Doc. 17 at 22.)  I conclude Plaintiff has not shown that the ALJ erred on this basis.

Listing 1.04 provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by finding on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

41

20 C.F.R. Pt. 404 Subpt. P App. 1.

In *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004), the Third Circuit Court of appeals emphasized that "'[f]or a claimant to show his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'"  *Id.* at 504 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  *Jones* also stated that there is no particular language or format that an ALJ must use so long as there is "sufficient development of the record and explanation of findings to permit meaningful review."  *Id.* at 505.  Furthermore, as noted in *Hernandez v. Comm'r  of Soc. Sec.*, 198 F. App'x 230, 235 (3d Cir. 2006) (not precedential), if the ALJ finds no documentation of required signs, there is nothing more he could have discussed and a plaintiff's complaint of inadequate discussion is without merit.

Listing 1.04C requires that a claimant satisfy Section 1.00B2b which provides as follows:

> b.   What we mean by inability to ambulate effectively.
>
> (1) Definition.  Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

42

> (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b.

ALJ Hardiman found that the evidence did not satisfy listing 1.04 because there are no post-surgical MRI studies and Plaintiff's EMG studies do not document ongoing nerve root compression, his 2010 EMG noted involvement of L4 through S1, but no specific findings as to T10-12, no nerve entrapment, and the tibial nerve was normal.  (R. 24 (citing R. 527-28).)  ALJ Hardiman also found no evidence of ineffective ambulation.  (*Id.*)

Plaintiff relies first on listing 1.04A in support of his argument that he meets or equals a listing, pointing to evidence of record addressing the requirements of the listing. (*See* Doc. 12 at 25-26.)  He specifically states that his EMG study showed nerve

root compression.  (Doc. 12 at 26 (citing R. 528).)  Dr. Pelicci's EMG October 11, 2010, Impression indicates nerve root "involvement" and "nerve root process" but does not establish ongoing nerve root compression.  (R. 528.)  Thus, Plaintiff has not shown that the ALJ is incorrect in her assertion that "EMG studies do not document ongoing nerve root compression."  (R. 24.)

Further, in his reply brief (Doc. 19) Plaintiff does not respond to Defendant's argument that he cannot show that he meets listing 1. 04A because the record does not support the necessary positive straight leg raise test in both the sitting and supine position (Doc. 17 at 24-25 (citing 20 C.F.R. pt 404, subpt. P, app. 1, § 1.04A)).[10]  As it is Plaintiff's burden to show that he meets *all* the requirements of a listing, *Jones*, 364 F.3d at 504, the fact that Plaintiff meets many requirements is not sufficient to sustain his burden.  Therefore, Plaintiff has not shown that the ALJ erred regarding listing 1.04A.

Plaintiff also notes that the ALJ's statement that there is

---

[10]  Plaintiff states in his supporting brief that "the record is also replete with positive straight leg raising findings." (Doc. 12 at 26.)  However, he does not provide citation to the record in support of his assertion.  My review of the record shows that Dr. Bianca did not reference straight leg testing when he was treating Plaintiff from December 2008 through January 2011, with office visits in December 2008, March 2009, July 2009, November 2009, March 2010, July 2010, and January 2011.  (R. 514-521.)  Dr. Pelicci found positive straight leg tests in October, November and December 2010, but he did not note such a finding in January 2011. (R. 524, 525, 526, 529.)  Dr. Bianca did not reference straight leg testing in his December 2012 Disability Evaluation.  (R. 643-45.) I do not find references to straight leg testing in Dr. Moran's office notes when he treated Plaintiff between April 2011 and September 2012 (R. 569-606) or between July 2013 and February 2014 (R. 663-80).

"'no evidence of ineffective ambulation' is totally unfounded and not supported by substantial evidence." (Doc. 12 at 26.)  In support of this assertion he cites Plaintiff's use of a cane at the hearing, Sr. Smith's and Dr. Moran's confirmation that Plaintiff required a cane to ambulate, and Dr. Bianca's finding of antalgic gait. (*Id.*)  While this evidence shows the record supports a finding of some gait and ambulation difficulties, listing 1.04C requires that a claimant satisfy the very specific definition set out in Section 1.00B2b.  Plaintiff does not address his ambulation difficulties in this context.  As noted by Defendant, Plaintiff does not require a walker, two crutches or two canes, he can walk short distances, he shops, and he climbs the stairs three times a day. (Doc. 17 at 26.)  Again, Plaintiff does not respond to the argument in his reply brief (Doc. 19).  Therefore, Plaintiff has not met his burden of showing the ALJ erred on the basis of her ambulation assessment.

## V. Conclusion

For the reasons discussed above, based on the evidence before the ALJ, I conclude Plaintiff's claimed errors are not cause for reversal or remand.  Therefore, Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: January 29, 2016